[No. 24745. *En Banc.* October 16, 1934.]

DORA BULLOCK, *a minor, by Lee Bullock, her guardian ad litem, Appellant,* v. KING COUNTY *et al., Respondents.*[1]

[1]Reported in 36 P. (2d) 609.

*Rummens & Griffin,* for appellant.

*A. C. Van Soelen* and *E. I. Jones,* for respondents.

BLAKE, J.—This is a negligence action, tried to the court without a jury. At the close of her own case, plaintiff took a voluntary nonsuit as to King county. The trial proceeded against the other defendants, and resulted in findings in their favor. Plaintiff appeals from judgment dismissing the action.

The essential facts, as disclosed by the evidence and found by the trial court, are as follows: Roxbury street runs east and west. Its middle line is the boundary between the city of Seattle and King county. Thirty-fifth avenue southwest runs north and south. For some years, the east eighteen feet of Thirty-fifth avenue has been paved with concrete—the pavement ending at the north line of Roxbury street. Thirty-fifth avenue extends on across and to the south of Roxbury street as a graveled highway. The city's side of Roxbury street has never been improved.

Prior to July 17, 1931, the county let a contract to respondent S. A. Moceri, Inc., for the paving with concrete of the county's side (the southerly half) of Roxbury street, from Thirty-fifth avenue on the west to a point some distance east. The city thereafter arranged with Moceri to pave so much of the intersection as was necessary to connect the old pavement on Thirty-fifth avenue and the new pavement being laid on Roxbury street. In order to do this, it was necessary to excavate the intersection to the level of the bottom of the pavement end on Thirty-fifth avenue. This excavation was done sometime in June, 1931.

Thirty-fifth avenue, however, was not closed to traffic. A pole, or timber, was placed at the end of the pavement on Thirty-fifth avenue. Dirt and gravel were thrown over it, making an inclined plane, or sort of ramp, between the surface of the pavement and the floor of the intersection. Barricades were maintained across Roxbury street, both on the east and west sides of Thirty-fifth avenue. At night, red lanterns were kept lighted on each of the barricades. No barricades nor red lights were maintained across or on any part of Thirty-fifth avenue. There was a three hundred watt electric light suspended over the intersection.

About ten-thirty of the night of July 17, 1931, appellant was riding in the rear seat of a Ford sedan, approaching Roxbury street from the south on Thirty-fifth avenue. None of the occupants of the car knew of the condition of the intersection. The car crossed the intersection at the rate of twelve to fourteen miles an hour. When it went up onto the pavement, appellant was bounced to the top of the car, sustaining the injuries for which she brought this action.

The ultimate finding upon which the court based its judgment was that the intersection was "in a reasonably safe condition for travel." The theory of the finding seems to be that the condition of the intersection was reasonably safe, in view of the construction work going on at the time. This, however, is not the standard by which liability is to be determined. It was the city's duty to use reasonable care to maintain the intersection in a reasonably safe condition for ordinary public travel. *Sutton v. Snohomish,* 11 Wash. 24, 39 Pac. 273, 48 Am. St. 847; *Larsen v. Sedro-Woolley,* 49 Wash. 134, 94 Pac. 938; *Swain v. Spokane,* 94 Wash. 616, 162 Pac. 991, L. R. A. 1917D, 754.

A street undergoing repairs may be closed to traffic. *Peterson v. Seattle,* 40 Wash. 33, 82 Pac. 141; *Stack*

*v. Dowell, Inc.,* 172 Wash. 9, 19 P. (2d) 125. Under some conditions, it may be the city's duty to close a street under repair. McQuillin, Municipal Corporations (2d ed.), § 2992. In any event, it can escape liability for failure to maintain a street in reasonably safe condition for travel only by setting up suitable barricades and lights to warn travelers of the unsafe condition of the street. *Peterson v. Seattle, supra; Tagge v. Roslyn,* 51 Wash. 258, 98 Pac. 668; *Lautenschlager v. Seattle,* 77 Wash. 12, 137 Pac. 323. The guards and warning devices must be sufficient to apprise a traveler, using reasonable care, that the street is not in a safe condition for ordinary travel. *Hunter v. Montesano,* 60 Wash. 489, 111 Pac. 571, Ann. Cas. 1912B, 955; McQuillin, Municipal Corporations (2d ed.), § 2993. McQuillin there says:

"It is the duty of the municipality, when the obstructions are placed in the street, to use such means as are reasonably necessary to warn those using the street of the presence of the obstruction, and it is generally a question for the jury, 'under the particular facts in each case, to determine whether or not the means used for this purpose were reasonably sufficient. Guard rails, lights, or watchmen, any or all, might be required, according to the local conditions. In some instances guard rails might be amply sufficient, in others, lights, while in still others additional means might be required. No hard and fast rule can be laid down fixing the means that shall be employed in each particular case, further than to say that they shall be such as are reasonably sufficient to warn the traveling public of the presence of the obstruction.' "

A watchman was maintained on the job at night. His duties, however, seem to have been the guarding of the contractor's equipment, rather than warning travelers on Thirty-fifth avenue of the condition of the intersection. He seems to have conceived his only duty in that respect was to maintain an inclined plane,

or ramp, from the surface of the pavement to the floor of the intersection. He was not present at the time of the accident.

We do not think it can be contended that the intersection was in a reasonably safe condition for ordinary travel. The road supervisor for that district in King county was called as a witness for respondents, and testified as follows:

"Q. Was the intersection in such shape that a person approaching from the south and driving ten, twelve miles an hour across that intersection would ordinarily have any difficulty in reaching this slope on the other side, or coming onto the pavement? A. Well, I wouldn't undertake to say at what rate of speed. I would always slow up where there was construction going on to as low a speed as you could handle your car with. Because that wasn't a finished roadway. It was a roughly excavated roadway that was bumpy. And a person wouldn't want to go over at any faster than just enough to control their car. I wouldn't say I went across there twelve miles an hour. I went across there slowly."

Nor do we think the barricades and lights maintained across Roxbury street sufficient to apprise travelers on Thirty-fifth avenue of danger in the intersection. It seems to us that the only reasonable inference to be drawn from them was that there was danger on Roxbury street to the east and west of Thirty-fifth avenue, and that the latter street was open to ordinary traffic. The portion of Thirty-fifth avenue west of the pavement was surfaced with gravel. A barrier and light might have been placed there, which would have given warning of danger to travelers on Thirty-fifth avenue. The electric light over the intersection was not a warning, and the fact that it was there did not relieve the city from maintaining barricades and red

lights. McQuillin Municipal Corporations (2d ed.), § 2993.

Having concluded that respondents are liable, the question of the amount of appellant's damages remains to be determined. Ordinarily, this is not a problem for this court to determine in the first instance. But under the record in this case, we are in as advantageous a position to determine that question as the trial court was, had it found for appellant. There is no dispute as to the character or extent of appellant's injuries. The appellant sustained a severe bump on the head, and was badly jarred and shocked. Her principal injury, however, consisted in the tearing loose of the ligaments which support the left clavicle. An operation was necessary to correct this injury. According to Doctor Wyckoff, the orthopedic specialist who attended appellant:

"The operation consisted of drilling the clavicle through at this point, taking a strip of fascie from the knee, passing that around the coracoid process, through the clavicle, stitching that, and bringing a strand down across this joint, and also suturing that in place."

The operation necessitated the use of a splint cast which caused a curvature of the spine. This curvature is the usual result of the treatment of such cases, but ordinarily disappears after the removal of the cast. In the appellant's case, however, the curvature was not corrected at the time of the trial. Doctor Wyckoff's prognosis was that the curvature was likely to be permanent; that there would likely be some permanent limitation of movement and weakness in the shoulder. Appellant suffered more or less pain in her shoulder even up to a short time before the trial (March, 1933). We are of the opinion that three thousand dollars will fairly compensate appellant for the damages she has sustained as the result of respondents' negligence.

Since this is a trial *de novo* (Rem. Rev. Stat., § 1736 [P. C. § 7321]), and since there is no controversy as to the extent of appellant's injuries, we think it is a proper case to exercise the power conferred by Rem. Rev. Stat., § 1737 [P. C. § 7322]. The cause is therefore remanded, with directions to enter judgment in favor of the appellant for three thousand dollars.

ALL CONCUR.